**Slip Op. 05-25**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                              :
United States,                                :
                                              :
    Plaintiff,                            :
                                              :
                                              :        Court No.
    v.                                    :        02-00116
                                              :
Ford Motor Company,                           :
                                              :
    Defendant.                            :
                                              :
_____   :

       Plaintiff, the United States Bureau of Customs and Border Protection of the Department of Homeland Security ("Customs"), moves pursuant to USCIT R. 56 for summary judgment for reconciliation, shortfall payment, prior disclosure and statute of limitations defenses. Customs seeks payment of a civil penalty and customs duties concerning entries of vehicles and vehicle components between 1987 and 1992 made by Ford Motor Company ("Ford"), defendant, in violation of 19 U.S.C. § 1592 (1988). Customs also moves to dismiss Ford's counterclaim. Ford opposes Customs' motion and cross-moves for partial summary judgment, stating that Ford fulfilled its obligation under 19 U.S.C. §§ 1484 and 1485 (1988). Additionally, Ford seeks a refund of all or part of the $8,575,961.80 in duties tendered in connection with this matter, and lawful interest.

       **Held:**    Plaintiff's motion for summary judgment and its motion to dismiss the counterclaim is denied. Defendant's cross-motion for partial summary judgment is denied.

       Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David A. Levitt and Michael Panzera); of counsel: Jeffrey E. Reim and Katherine Kramarich, United States Bureau of Customs and Border Protection, for the United States, plaintiff.

       Grunfeld, Desiderio, Lebowitz, Silverman, & Klestadt, LLP (Steven P. Florsheim, Robert B. Silverman, David M. Murphy, and Frances P. Hadfield); of counsel: Paulsen K. Vandevert, Ford Motor Company, for Ford Motor Company, defendant.

       Dated: February 18, 2005

**OPINION AND ORDER**

**TSOUCALAS, Senior Judge:** Plaintiff, the United States Bureau of Customs and Border Protection of the Department of Homeland Security ("Customs"),[1] moves pursuant to USCIT R. 56 for summary judgment for reconciliation, shortfall payment, prior disclosure and statute of limitations defenses.  Customs seeks payment of a civil penalty and customs duties concerning entries of vehicles and vehicle components between 1987 and 1992 made by Ford Motor Company ("Ford"), defendant, in violation of 19 U.S.C. § 1592 (1988).[2] Customs also moves to dismiss Ford's counterclaim.  Ford opposes Customs' motion and cross-moves for partial summary judgment, stating that Ford fulfilled its obligation under 19 U.S.C. §§ 1484 and 1485 (1988).  Additionally, Ford seeks a refund of all or part of the $8,575,961.80 in duties tendered in connection with this matter, and lawful interest.

---

[1]    The United States Customs Service was renamed the Bureau of Customs and Border Protection of the Department of Homeland Security, effective March 1, 2003. See H.R. Doc. No. 108-32 (2003).

[2]    Customs asserts that it was deprived of $8,644,139.80 in lawful duty, of which $68,178 remains unpaid. See Complaint at ¶ 9.  Customs seeks civil penalties in the amount of $34,576,559 if Ford's conduct is found grossly negligent and $17,288,279 if Ford's conduct is found negligent. See Complaint at ¶¶ 13-17.

## BACKGROUND

On October 28, 2004, Customs moved for summary judgement on reconciliation, shortfall payment, prior disclosure and statute of limitations defenses raised by Ford and also moved to dismiss Ford's counterclaim for failure to state a claim upon which relief can be granted. See Mot. Summ. J. Reconciliation, Shortfall Payment, Prior Disclosure, Statute Limitations Defenses Dismiss Countercl. ("Customs' Mot."). Ford responded on December 15, 2004. See Def.'s Resp. Pl.'s Mot. Summ. J. Prior Disclosure Statute Limitations Defenses Dismiss Countercl. ("Ford's Response"). On October 28, 2004, Ford moved for partial summary judgment. See Def.'s Mot. Partial Sum. J. ("Ford's Mot."). Customs filed its response with this Court on December 16, 2004. See Resp. Customs' Def.'s Mot. Partial Summ. J.. Customs and Ford submitted a proposed joint pretrial order on January 5, 2005. See Pretrial Order. The Court heard oral arguments on February 7, 2005.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1582, 1583, and 1585 (2000).

## STANDARD OF REVIEW

On a motion for summary judgment, the Court must determine whether there are any genuine issues of fact that are material to

the resolution of the action. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if it might affect the outcome of the suit under the governing law. See id. A genuine dispute for trial exists only if there is evidence from which a reasonably jury could return a verdict for the non-moving party. See id. Accordingly, the Court may not decide or try factual issues upon a motion for summary judgment. See Phone-Mate, Inc. v. United States, 12 CIT 575, 577, 690 F. Supp. 1048, 1050 (1988). When genuine issues of material fact are not in dispute, summary judgment is appropriate if a moving party is entitled to judgment as a matter of law. See USCIT R. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden of demonstrating an absence of genuine disputes as to material facts is on the moving party. See Celotex, 477 U.S. at 323. Once that burden is discharged, the nonmoving party has the burden of showing specific facts in dispute. See id.

The Court may dismiss a counterclaim for failure to state a claim only "where it appears beyond doubt that plaintiff can prove no set of facts which will entitle him to relief." Constant v. Advanced Micro-Devices, Inc. 848 F.2d 1560, 1565 (Fed. Cir. 1998) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Moreover, the Court must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party. See United

States v. Islip, 22 CIT 852, 854, 18 F. Supp. 2d 1047, 1051 (1998) (citing Gould, Inc. v. United States, 935 F. 2d 1271, 1274 (Fed. Circ. 1991)). A plaintiff is only required to set out in detail the facts upon which the claim is based so that the defendant has "fair notice of what his claim is and the grounds upon which it rests." Conley 355 U.S. at 47.

## DISCUSSION

### I.  Factual Background

Ford's supply agreements with many of its foreign vendors contained post-importation price adjustments, which typically provided a per vehicle or component base price subject to possible modifications. See Pretrial Order, Schedule C at ¶ 1. Ford entered the merchandise subject to this action beginning January 1, 1987 and continuing through December 31, 1992.[3] See Complaint at ¶ 5. On October 14, 1988, Ford proposed to Customs that it be allowed to track all lump sum billings throughout each model year, which runs from July 1 to June 30, and report dutiable expenses associated with each import program in a reconciliation report. See Pretrial Order, Schedule C at ¶ 5. Under Ford's proposal, the reconciliation report was to be "filed with the Detroit customs

---

[3]  The subject entries consisted of vehicles, vehicle engines, and automotive parts/components entered through various ports. See Complaint at ¶ 5.

district within 60 days after the close of each model year (July 30)." Id. In a letter dated August 29, 1989, Customs approved the proposal for the annual reporting of price adjustments and payment of duty within 60 days of the close of each model year ("Reconciliation Agreement"). See id. at ¶ 8. On May 23, 1991, Customs informed Ford, in writing, that it was opening a formal investigation of the company regarding the proper declaration of assists and indirect payments on imports of vehicles and vehicle components. See id. at ¶ 14.

On May 22, 1992, Ford submitted a letter to Customs, which it claimed to be a prior disclosure, concerning certain undervaluations of imported tooling assists for the period of 1987 through 1992. See id. at ¶ 24. Customs, however, did not accept the letter as a prior disclosure. See id. On November 18, 1992, Ford tendered $1,304,847.95 in duties and fees in connection with undeclared tooling assist on merchandise imported between January 1, 1987 through May 22, 1992. See id. Furthermore, on August 6, 1992 Ford submitted a letter to Customs claiming to be a prior disclosure relating to lump sum payments for merchandise imported between 1987 and August 6, 1992. See id. at ¶ 39. Ford explained that it undervalued these goods because their price had been revised subsequent to importation and Ford had failed to identify and report the changes to Customs. See id. On December 16, 1992,

Ford tendered $848,262.34 as unpaid duty in relation to these transactions and stated that it needed further time to analyze some additional payments. See id. On January 29, 1993, Ford tendered an additional $17,888.23 as duty for unreported lump sum payments for merchandise imported between 1987 and 1992. See id.

On October 22, 1992, Ford indicated to Customs that it had manufactured developmental engine parts for engines manufactured at its Windsor (Canada) Essex Plant. See id. at ¶ 40. These parts were provided free of charge to the plant and Ford had provided $1,327,455 worth of such parts for the 1990, 1991, and 1992 model year engines manufactured at the plant. See id. Accordingly, on April 13, 1993, Ford tendered $15,920.95 in duty for these undeclared assists. See id.

### A. Capri Vehicles

On June 7, 1991, Ford and Customs had a meeting to discuss the scope of Customs' investigation targeting undeclared assists and indirect payments. See Pretrial Order, Schedule C at ¶¶ 13, 15. Customs served Ford with a summons for records relating to the Mercury Capri ("Capri") vehicle import program. See id. at ¶ 16. The summons was for all records related to any and all assists and payments made in connection with the design, development, engineering, production, purchase, and importation of the Capri vehicles. See id. On August 26, 1991, Ford tendered $155,708 of

duty to Customs indicating that it had made supplemental lump sum payments to Ford of Australia for the 1991 model year Capri. <u>See</u> <u>id.</u> at ¶ 17. On September 5, 1991, Ford provided Customs with a copy of the supply contract for the Capri, which indicated that transfer prices would be adjusted every six months to reflect increases or decreases in a market basket of similar vehicles. <u>See</u> <u>id.</u> at ¶ 19. The documents submitted by Ford indicated that two undeclared lump sum payments totaling $5,570,900 had been made for 1991 model year Capri vehicles entered in the Port of San Francisco. <u>See</u> <u>id.</u>

### B.    Festiva Vehicles

On January 22, 1992, Customs issued a summons for information regarding Festiva vehicles supplies by KM Corporation of Korea. <u>See</u> Pretrial Order, Schedule C at ¶ 20. Ford submitted to Customs copies of its supply agreements for the Festiva program including the supply agreement between Ford and the Mazda Motor Corporation ("Mazda"), entitled <u>Passenger Vehicle Program Agreement</u>, and dated July 1, 1988.. <u>See</u> <u>id.</u> at ¶ 26. In this agreement, Ford agreed to purchase 85,000 Festiva vehicles for the United States and Canadian markets. <u>See</u> <u>id.</u> If Ford failed to purchase 85,000 vehicles, then it was subject to a per vehicle price adjustment. <u>See</u> <u>id.</u> The agreement between the two companies outlined various formulas whereby the purchase price was to be further adjusted based on the

number of vehicles Ford purchased for each model year to arrive at the "Market Basket" purchase price. See id. On June 5, 1992, Ford apprised Customs that there had been $11,408,470.92 of undeclared engineering and tooling costs prior to the 1993 model year Festiva. See id. at ¶ 25. Ford stated that it owed $309,169.56 in duties and other fees and tendered the duty on April 29, 1993, after Custom's review. See id. On November 13, 1992, Ford tendered $362,013 as the duty and fees for an alleged "production shortfall" in connection with the Festiva program. See id. at ¶ 27. On November 18, 1992, Ford tendered $1,091,578 as the duty owed for a supplemental lump sum payment of $43,663,125 for Festiva vehicles entered between April 1, 1991 and July 31, 1992. See id. at ¶ 28.

### C.    Yamaha SHO Engines

Customs issues a summons on January 22, 1992, for all documents and records related to any and all assists given and payments made by Ford in connection with the Yamaha SHO engine program. See Pretrial Order, Schedule C at ¶ 29. On June 5, 1992, in response to the summons, Ford disclosed that it had failed to declare $282,112 of merchandise value for the 3.0 liter SHO engines. See id. at ¶ 30. After Customs reviewed the information Ford provided, Ford tendered $9,623.16 for the duty owed on the 3.0 liter SHO engines. See id. In addition, Ford provided Customs with a copy of its supply agreement, indicating that the base price

for the SHO engines could be adjusted.  See id. at ¶ 31.  On June 5, 1992, Ford responded that there were $14,779,026 in prototype and development costs for the 3.2 liter SHO engines for the 1993 model year, which would be declared 60 days after the end of the 1992 model year, July 30, 1992.  See id. at ¶ 32.

On November 13, 1992, Ford identified further post-entry payments for the 3.0 liter SHO engines and tendered $59,707 for the duty.  See id. at ¶ 34.  On November 18, 1992, Ford tendered $404,100 for duty associated with lump sum payments of $14,274,097 for design and development costs for the 3.2 liter SHO engines made during 1991 and 1992.  See id. at ¶ 35.  Ford also indicated that at the end of the 1993 model year it would reconcile actual usage and tender additional money owed or request a refund based on actual occurrences during the 1993 model year.  See id.  In a meeting with Customs Import Specialist Spiro Karras on December 18, 1992, Ford admitted that it had not declared development costs apportioned to Yamaha prototype 3.2 liter SHO engines that were to be retained in Japan rather than shipped to the United States.  See id. at ¶ 36.  Ford sought advice from Customs' Office of Regulations and Rulings and was advised that the development costs should be apportioned over the imported production engines.  See

id. Ford did not tender $68,178 of alleged duty owed on the undeclared development costs for 3.2 liter SHO engines. See id. at ¶ 37.

**D.    Engines From Germany and Transmissions from France**

On March 23, 1992, Ford advised Customs that lump sum payments totaling $21,401,808 and $32,130,256 had been made to Ford of Germany for 1991 model year 2.9 liter and 4.0 liter V-6 engines, respectively.  See id. at ¶ 21-22.  Ford tendered $726,591 and $1,047,074, respectively, for duty on these payments. See id.  On May 6, 1993, Ford disclosed it had made lump sum payments to Ford of Germany totaling $4,783,094 for 1991 model year V-6 engines. See id. at ¶ 42. Therefore, Ford tendered $162,625 for the duty. See id.  Ford also disclosed on May 6, 1993, that it had made lump sum payments to Ford of Germany for 1992 model year 4.0 liter V-6 engines in the amount of $25,728,951.  See id. at ¶ 43.  Ford tendered $695,874 in unpaid duty in connection with these payments. See id.

Ford also disclosed, on March 23, 1992, that lump sum payments in the amount of $10,875,431 had been made to Ford of France for 1991 model year A4LD Bordeaux transmissions.  See id. at ¶ 23. Accordingly, Ford tendered $339,379 for duty in connection with these payments.  See id.  On May 6, 1993, Ford disclosed that it had made lump sum payments to Ford of France in the amount of

$16,359,794 for 1992 model year A4LD Bordeaux and tendered $458,893 for the unpaid duty.  See id. at ¶ 44.


## II.  Statutory Background

Customs is directed to appraise imported merchandise based on the transaction value.  See 19 U.S.C. § 1401a(a)(1)(A) (1988).  The statute defines transaction value as "the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to . . . the value, apportioned as appropriate, of any assists . . . ."  19 U.S.C. § 1401a(b)(1). Under 19 U.S.C. § 1481(a), all invoices for imported merchandise are required to set forth, among other things, "[t]he purchase price of each item in the currency of the purchase, if the merchandise is shipped in pursuance of a purchase or an agreement to purchase."  19 U.S.C. § 1481(a)(5) (1988).  The statute also states that the invoices must contain "[a]ny other facts deemed necessary to a proper appraisement, examination, and classification of the merchandise  that [Customs] may require. "  19 U.S.C. § 1481(a)(10).

Pursuant to 19 U.S.C. § 1484(a)(1)(B), an importer is obligated to file, at the time of entry, such "other documentation as is necessary to enable [Customs] to assess properly the duties on the merchandise . . . ."  Id.  Furthermore, an importer must

sign the entry form and "set forth such facts in regard to the importation as [Customs] may require for the purpose of assessing duties . . . ." 19 U.S.C. § 1484(d). An importer making an entry under the provisions of 19 U.S.C. § 1484 must file a declaration under oath stating that "the prices set forth in the invoice are true, in the case of merchandise purchased or agreed to be purchased . . . [and that] all other statements in the invoice or other documents filed with the entry, or in the entry itself, are true and correct . . . ." 19 U.S.C. § 1485(a)(2) & (3). The importer also must declare "[t]hat he will produce at once to the appropriate customs officer any invoice, paper, letter, document, or information received showing that any such prices or statements are not true or correct." 19 U.S.C. § 1485(a)(4).

Under 19 U.S.C. § 1952, "no person, by fraud, gross negligence, or negligence–(A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of– (i) any document, written or oral statement, or act which is material and false, or (ii) an omission which is material . . . ." 19 U.S.C. § 1592(a). If an importer discloses facts and circumstance relating to a violation, then the maximum penalty is significantly reduced. See 19 U.S.C. § 1592(c)(4). Such disclosure, however, must come prior to the commencement of an investigation by Customs relating to a violation, or with a lack of

knowledge of the commencement of such investigation. See id. If the alleged violator asserts a lack of knowledge of the commencement of a formal investigation, then such person bears the burden of proving such lack of knowledge. See id. A formal investigation is considered to be commenced on the earliest of the following: (1) the date recorded in writing in the investigatory record; (2) the date an investigating agent identified himself and the nature of his inquiry, in writing or in person; or (3) the date an investigating agent, after identifying himself and the nature of his inquiry, requested specific books and records. See 19 CFR § 162.74(d)(4) (1988).

## III. Further Findings of Fact are Required to Determine if Ford Complied with the Reconciliation Agreement

### A.    Contention of the Parties

#### 1.    Customs' Contentions

Customs contends that Ford violated 19 U.S.C. § 1592 by making false statements or omissions in connection with the entry into the United States of the merchandise at issue. See Customs' Mot. at 17. Specifically, Customs argues that Ford provided false prices in connection with the entries and that Ford failed to immediately advise Customs of additional payments made for the imported merchandise or of changes to the price information previously provided to Customs. See id. Ford was required to provide true

and correct information in its invoices remitted at the time of entry. See id. at 18 (citing 19 U.S.C. §§ 1481, 1484, & 1485). Furthermore, Customs asserts that, under the Reconciliation Agreement, Ford was required to file an annual reconciliation report for each import "with the Detroit Customs District within 60 days after the close of each model year (July 30) . . . ." Id. (emphasis in original). Customs alleges that Ford did not comply with the Reconciliation Agreement because it failed to file the reports and tender duties within 60 days of the close of the model year. See id. at 20.

Additionally, Customs argues that the Reconciliation Agreement did not relieve Ford of its liability under 19 U.S.C. § 1592. See Customs' Mot. at 20. Customs alleges that Ford falsely represented in its entry documents that the prices were true and accurate although it knew those prices were not final. See id. at 20-21. Customs maintains that the Reconciliation Agreement "did not allow [Ford] to misrepresent the facts at the time of entry, nor does subsequently tendering duties serve to negate a prior violation." Id. at 21.

### 2.   Ford's Contentions

Ford responds that it complied with the Reconciliation Agreement and all applicable reporting requirements. See Ford's Resp. at 19-26; see also Ford's Mot. at 9-18. Ford maintains that

there is no statute, regulation or Customs' directive which sets requirements for merchandise entered with provisional prices. See Ford's Mot. at 9.  Ford argues that "[t]he mere fact that a price may change after entry or that additional payments are made to the vendor at a later date does not mean that the entry was incorrect when it was filed."  Ford's Resp. at 17.  Ford also argues that its tenders were not late under the Reconciliation Agreement because the 60-day filing time frame was a "target date" and not a final deadline.  See id. at 8 & 21.  Ford maintains that Customs' acceptance of Fords submissions for years "led Ford to believe that it was acceptable to file voluntary submissions after 60 days under the [Reconciliation Agreement] and the law."  Id. at 25.  Ford further argues that Customs misinterprets the "at once" standard, set forth in 19 U.S.C. § 1485, because Ford was only required to place Customs on notice that the values of previously entered goods were incorrect.  See id. at 22.  Ford maintains that the Reconciliation Agreement put Customs on notice that it would regularly report post-entry price adjustments and lump sum payments to Customs.  See id. at 23.

### B.  Analysis

Pursuant to USCIT R. 56, summary judgment is only appropriate if the Court determines that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

a matter of law.  See Anderson, 477 U.S. at 248-50; see also Precision, 24 CIT at 1023, 116 F. Supp. 2d at 1359.  In the case at bar, summary judgment is not appropriate as to whether Ford complied with the Reconciliation Agreement or violated 19 U.S.C. §§ 1481, 1484 and 1485.  The Reconciliation Agreement is a central component to Customs' contention that Ford violated the statutes, and that civil penalties are therefore warranted.  Customs alleges that Ford failed to comply with the Reconciliation Agreement and that, with the exception of one of the twenty-one duty tenders in issue, Ford failed to file the reconciliation reports and tender duties within the 60 days of the close of the model year.[4] See Ford's Mot. at 20.  Ford responds that it fully complied with the Reconciliation Agreement and that its tenders were not late. See Ford's Resp. at 21.  Ford maintains that the 60-day filing time frame was a "target date" for Ford's filings and not a final deadline.  See id. at 8 & 21.  The Court concludes that whether Ford's tenders were timely under the Reconciliation Agreement are issues of material fact that remain in dispute.

---

[4]    Customs points to the tenders made by Ford for various entries on March 23, 1992, November 13 and 18, 1992, December 16, 1992, January 29, 1993, March 25, 1993, April 29, 1993, May 6, 1993, August 9, 1993, September 2, 1993, December 1, 1993, as being delinquent pursuant to the Reconciliation Agreement. See Customs' Mot. at 19.

Moreover, whether Ford fulfilled the "at once" requirement of 19 U.S.C. § 1485 is also an issue of material fact that remains in dispute. Customs alleges that Ford falsely represented that the prices submitted at the time of importation were true and accurate because Ford knew those prices were not final. See Customs' Mot. at 20-21. Ford responds that the "at once" standard only required Ford to provide Customs with notice that the values of previously entered goods were incorrect. See Ford's Resp. at 22. Ford argues that the Reconciliation Agreement placed Customs on notice that it would regularly report post-entry price adjustments and lump sum payments to Customs. See id. at 23. The Court finds that the terms of the Reconciliation Agreement, and whether it altered the "at once" requirement, are issues of material fact in dispute. Accordingly, this issue cannot be disposed of on a motion for summary judgment. See Anderson, 477 U.S. at 248-50; see also Precision, 24 CIT at 1023, 116 F. Supp. 2d at 1359. Custom's motion and Ford's cross-motion are, therefore, denied with respect to whether Ford satisfied the requirements of 19 U.S.C. §§ 1481, 1484 and 1485.

## IV. Further Findings of Fact are Required to Determine Whether Ford's Submissions Constitute Prior Disclosures

The Court finds that issues of material fact are in dispute with respect to whether Ford's submissions qualify for prior

disclosure treatment. Customs argues that certain tenders made by Ford cannot be prior disclosures because they were not made before, or without knowledge of, the commencement of the underlying investigation. See Customs' Mot. at 21-25. Here, Customs argues that pursuant to 19 C.F.R. § 162.74(d)(4) and (f), Ford had knowledge, by May 20, 1991 or May 23, 1991, that a formal investigation by Customs was underway. See id. at 22. Customs maintains that "the documentary evidence establishes that Ford was aware that the investigation encompassed all undeclared payments and was not limited in any way." Id. at 24. Accordingly, Customs contends that all submissions concerning undeclared costs made after May 1991 are not entitled to prior disclosure treatment.

Ford contests Customs' assertion that the formal investigation began in May 1991 and that Ford's submissions are not prior disclosures. See Ford's Resp. at 26-28; see also Ford's Mot. at 19-26 . Ford argues that the formal investigation that began in May 1991 was limited to assists and indirect payments. See Ford's Mot. at 19-23. Ford notes that a letter sent by Customs, dated May 23, 1991, indicates that the investigation was for Ford's failure to declare assists and indirect payments in its importation of vehicles and vehicle component assemblies. See Ford's Resp. at 26; see also Ford's Mot. at 20. Therefore, Ford was not precluded from filing prior disclosures unrelated to that investigation. See

Ford's Resp. at 26. Moreover, Ford contends that, at a meeting held on June 7, 1991, it was notified that the investigation was only for assists and indirect payments. See Ford's Resp. at 27. Accordingly, Ford contends that its direct payments to its vendors after May 1991 qualify for prior disclosures treatment because they fall outside the scope of the investigation of assists and indirect payments. See id. at 28.

The date, if any, on which Customs commenced its formal investigation of Ford's payments to its vendors remains in dispute. Moreover, the scope of Customs' investigation and whether it merely covered assists and indirect payments or also included Ford's payments to its vendors in connection with the subject entries remains an issue of material fact in dispute. If Ford is correct that the formal investigation did not begin in May 1991, the Court must determine when, if ever, a formal investigation concerning the payments at issue began. Summary judgment is only appropriate when issues of material fact are not in dispute. See Anderson, 477 U.S. at 248-50; see also Precision, 24 CIT at 1023, 116 F. Supp. 2d at 1359. Accordingly, the Court denies Customs motion and Ford's cross-motion for summary judgment with respect to whether Ford's submission qualify for prior disclosure treatment.

**V.    Further Findings of Fact are Required to Determine Whether Ford's Post-Importation Payments to Mazda are Dutiable**

Summary judgment is not appropriate on the issue of whether certain payments by Ford for the 1990, 1991, and 1992 model year Festiva vehicles were shortfall payments and therefore not dutiable.  The nature of Ford's agreement with Mazda and whether the payments Ford made constitute a contractual penalty or an adjustment in the purchase price requires further findings of fact.  Customs argues that the alleged shortfall payments are not the type of payments which were found not dutiable in Chrysler Corp. v. United States, 17 CIT 1049 (1993).  See Customs' Mot. at 27.  The shortfall payments in Chrysler "were found to be non-dutiable based upon specific contractual provisions that addressed the buyer's failure to purchase merchandise . . . ."  Id. at 29.  Here, Customs contends that all of the agreements between Ford and Mazda were based on Ford's actions to purchase merchandise.  See id.  Customs argues that the agreements merely adjust the price of the vehicles Ford actually purchased and do not penalize Ford for its failure to meet a specific volume commitment.  See id.  Customs asserts that "[a]t most, the agreements only provide for cancellation costs, and those costs may not even apply to Ford," because either party may elect to terminate the agreement.  Id. at 29-30.

Ford maintains that the amount paid to Mazda was a contractual penalty for vehicles Ford failed to purchase from Mazda.

See Ford's Resp. at 31.  Ford contends that the payments at issue are related the "Annual Volume Commitment" provision of Ford's contract with Mazda.  See id. at 28-33.  The terms of the agreement demonstrate that the volume adjustment is distinguishable in form and substance from any other adjustments contained in its agreement with Mazda.  See id. at 29.  The volume adjustments called for under the agreement, according to Ford, are essentially the same to the facts of Chrysler, where the court found "that shortfall payments were in the nature of a contract penalty and not part of the price paid or payable for the merchandise."  Id.  The sole difference between Chrysler and this case, Ford argues, is the method for calculating the amount of the shortfall payment.  See id. at 30.  Furthermore, the amount paid to Mazda did not effect the price of vehicles actually imported even though the amount was based on the "initial purchase price" set forth in the agreement.  See id. at 30-31.

Without further findings of fact, the Court cannot determine the nature of Ford's agreement with Mazda and in turn whether such payments are dutiable.  Accordingly, the Court denies Customs' motion for summary judgment on the payments Ford made to Mazda.

## VI. Further findings of Fact are Required to Determine Whether Ford Waived its Statute of Limitations Defense

Whether Ford has waived its statute of limitations defense is not ripe for summary judgment because issues of material fact remain in dispute. Customs argues that Ford executed a waiver of this defense on March 6, 2001. See Customs' Mot. at 31. Such waiver, according to Customs, was the last in a series of waivers dating back to the early 1990s. See id. Ford argues that the waiver related only to retroactive payments made to Yamaha for SHO engines imported between August 1, 1988, to date and did not include payments outside the scope of District Penalty Case 93-3801-21524-339. See Ford's Resp. at 44. Ford also argues that the waiver "does not explicitly include the claim for $68,178 in additional duties due on prototype engines . . . ." Id. The content of Ford's executed waiver and whether Ford in fact waived its statute of limitations defense remains in dispute. Accordingly, Customs' motion for summary judgment is denied.

## VII. Ford's Counterclaim for a Refund of Overpayments is Proper

Customs moves to dismiss Ford's counterclaim to refund duties it tendered to Customs. See Customs' Mot. at 31-38. Customs argues that Ford has failed to identify any statute or regulatory basis for obtaining a refund. See id. at 31. Under USCIT R. 13 and 8(a), however, Ford is not required to identify such a basis

for its counterclaim. Ford may bring as a counterclaim "any claim which at the time of serving the pleading the pleader has against any opposing party, if (1) the claim involves the imported merchandise that is the subject matter of the civil action . . . ." USCIT R. 13(a). Furthermore, such counterclaim "may or may not diminish or defeat the recovery sought by the opposing party." USCIT R. 13(b). Under USCIT R. 8(a), Ford's counterclaim must contain "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." USCIT R. 8(a). The Court finds that Ford's pleading meets the requirements of this court's rules and includes sufficient facts to support its claim. Therefore, the Court denies Customs' motion to dismiss Ford's counterclaim.

## CONCLUSION

The Court finds that further findings of fact are required with respect to: (1) whether Ford complied with the Reconciliation Agreement or violated 19 U.S.C. §§ 1481, 1484, and 1485; (2) whether Ford's submissions qualify for prior disclosure treatment; (3) whether Ford's post-importation payments to Mazda constitute a penalty or price adjustment; and (4) whether Ford waived its statute of limitations defense with respect to prototype Yamaha SHO

engines.  The Court finds that Ford satisfied the court's rules with respect to its counterclaim for a refund of tendered duties.

For the foregoing reasons, the Court denies Customs' motions for summary judgment and to dismiss Ford's counterclaim and denies Ford's motion for partial summary judgment.  Accordingly, parties are hereby ordered to proceed with litigation on the merits.


 /s/ Nicholas Tsoucalas
NICHOLAS TSOUCALAS
SENIOR JUDGE


Dated:     February 18, 2005
           New York, New York